### BROWN v. SCHLEIER et al.

#### (Circuit Court, D. Colorado. December 30, 1901.)

#### No. 4,116.

1. NATIONAL BANKS—RECEIVERS—RIGHT TO AVOID CONTRACTS.

The receiver of a national bank succeeds to no rights beyond those which could have been enforced by the bank, its stockholders or creditors. He is not entitled to have a contract made by the bank, and which has been executed, set aside on the ground merely that it was ultra vires.

2. SAME—CONTRACTS ULTRA VIRES.

The receiver of a national bank cannot attack the validity of a contract by which the bank leased ground for 99 years for the purpose of building thereon, on the ground that it was ultra vires, since the bank was authorized to purchase and hold in fee real estate for certain specified purposes, and the question whether it exceeded its powers either in making the lease, or in the erection of the building, is one which can only be raised by the government.

3. SAME—INDEBTEDNESS CREATED BY CONTRACT—LEASE.

A contract by which a national bank leased ground for 99 years, agreeing to pay a monthly rental therefor, does not create an indebtedness for the full amount of the rental accruing during the term.

4. SAME—SUIT BY RECEIVER.

A national bank leased ground for a term of 99 years, and expended over $300,000 in the erection of a building thereon. It occupied a portion of the building as a banking house, and rented the remainder to tenants. By a subsequent contract it surrendered the building to the owner of the land, and the lease was canceled. A receiver was afterwards appointed for the bank, who brought suit to charge the property with a

112 F.—37

lien for the money expended in the erection of the building, on the ground that the action of the bank in making the lease and in expending the money was ultra vires. No fraud was shown in the transaction, and it did not appear that any of the creditors were such when the lease was made. *Held,* that the receiver, under such circumstances, had no greater rights than the bank, and that the bill stated no grounds for relief.[1]

## In Equity. On demurrer to bill.

This is a bill in equity brought by the receiver of the People's National Bank of Denver against George C. Schleier and the bank for the purpose of following certain moneys expended by the bank in the construction of the People's Bank Building, located on the corner of Sixteenth and Lawrence streets. The case is before the court upon demurrers filed by the defendants to the bill of complaint. The facts as disclosed by the bill may be briefly stated as follows: The defendant the People's National Bank of Denver, Colo., was incorporated on the 1st day of August, 1899, under the national banking act, with the usual powers of such corporations. The capital stock of the bank was $300,000. The bank was to do business in the city of Denver, and the period of its corporate existence under its charter was 20 years. In the month of September, 1899, the defendant George C. Schleier was the owner in fee simple and in possession of lots numbered 1, 2, 3, and 4, in block 75, in the East division of the city of Denver; said lots being at and near the corner of Lawrence and Sixteenth streets. On the 12th of September, 1899, the defendant bank entered into a lease with the defendant Schleier for the lots above described for the period of 99 years from the 1st day of November, 1890, with an option to extend the lease for a further period of 50 years, at an annual rental of $13,975, to be paid in 12 equal monthly installments. In addition to the payment of rentals, the bank agreed to remove at its own cost and expense the store rooms and buildings located on the ground, and within 18 months from the 1st day of February, 1890, at its own cost and expense, to erect thereon a good, substantial building, not less than four stories in height, and to cost not less than $100,000; said building to become at once a part of the realty. The bank further agreed to keep the building and improvements erected on the land leased in good order and repair, at its own cost and expense. On the 21st day of September, 1899, the lease was duly recorded in the office of the county clerk and recorder of Arapahoe county, Colo., in Book No. 547, at page 1. The bank entered into possession of the premises under the lease, and thereafter removed the buildings then upon the ground, and proceeded with the construction of the new building, described in the bill as the "Bank Building," at a cost of $305,725.39. The building contained not only necessary offices for the use of the bank in conducting its banking business, but also six store rooms and a number of office rooms, which the bank rented to parties not connected with it either as stockholders or otherwise. The bank building was completed in January, 1891, and from that time on, until it ceased to do business, the bank occupied it. The bank continued to conduct therein its business as a national banking association, renting a portion of its main or first floor to a corporation organized under the laws of the state of Colorado, and known as the People's Savings Bank, and also renting the other offices and store rooms in said building, collecting the rents therefor. On the 19th day of July, 1893, the bank being unable to pay its depositors in due course of business, it was, under and by virtue of the provisions of the national banking act, placed in the hands of the comptroller of the currency. One J. B. Lozear was appointed receiver thereof, and as such receiver took charge of the bank and its affairs from the 19th day of July until the 21st of August, 1893. On that date, the bank having agreed to make a voluntary assessment of 20 per cent. to restore the impairment of its share capital, the receiver was discharged, and the directors and officers of the bank took charge and conducted the business until the ap-

---

[1] Action by or against receivers, see note to Plow Works v. Finks, 26 C. C. A. 49.

pointment of the receiver herein. The bill alleges that the affairs of the defendant bank were very much involved, mixed, and commingled with those of the People's Savings Bank, and that by reason thereof the savings bank was unable to proceed with its business, and on the 29th of June, 1895, made a general assignment of all of its assets and estate to one Fermor J. Spencer, who has ever since been, and still is, in the possession, control, and management of the assets, business, and affairs of the savings bank, and that he, as such assignee, on the 20th day of November, 1899, procured a judgment against the defendant bank for the sum of $475,825.71, which remains unpaid. It is alleged that in January, 1897, the defendant bank commenced to take steps looking to a voluntary liquidation and a surrender of its charter; that thereafter, and on or about the 27th day of April, 1897, the stockholders of the defendant bank published a notice of the bank's intention to go into liquidation and for the presentation of claims,—fixing the 27th day of June, 1897, as the last day on which claims could be presented. It is further alleged that on the 26th day of June, 1897, Spencer, as assignee of the savings bank, threatened to commence, and did, to the extent of serving the summons, commence, an action against the defendant national bank, and at the same time served notice of the claims and demands of the savings bank against the People's National Bank; that thereafter, on the 2d of July, Spencer and the People's National Bank entered into a contract whereby it was agreed that Spencer should refrain from taking any further steps in that suit until the 1st of January, 1898,—the same to be without any prejudice to his rights,—and, in consideration of the delay in filing the complaint in that suit, the defendant bank agreed that it would take no further action of any kind or nature to the prejudice of Spencer as assignee, by the surrender of its charter or the disposal of its property. It is further alleged that on the 20th of September, 1897, the defendant People's National Bank issued a notice and called a special meeting of its stockholders for the purpose of considering the proposition to turn over the banking house of the bank to George C. Schleier, the owner of the land upon which the building was situated, and thereafter the defendant bank, in violation of the statutes of the United States in such case made and provided, and contrary to the principles of equity governing the distribution and disposition of assets in the payment of dividends on dissolution of insolvent corporations, in consideration of being released from the obligation of paying the taxes, assessments, and rents then due under the lease, and of the release by Schleier of the bank and all its stockholders from any and all liability which might thereafter accrue against them, or either of them, under and by virtue of the covenants of the lease, conveyed and surrendered the premises covered by the lease, including the improvements thereon, to Schleier, his heirs and assigns; that the lease was thereupon canceled, and Schleier entered into possession of the premises, which he still holds.

Cranston, Pitkin & Moore, H. M. Orahood, J. H. Brown, and Watters & Kendall, for complainant.

R. D. Thompson, Bartels & Blood, and John M. Waldron, for defendants.

RINER, District Judge (after stating the facts). In disposing of the case presented by this record, it may be well to briefly consider at the outset just what relation the receiver bears to this litigation. While I think it is undoubtedly true, as stated by Mr. Justice Miller in Case v. Terrell, 11 Wall. 202, 20 L. Ed. 134, that the receiver represents the bank, its stockholders, its creditors, and does not in any sense represent the government, yet it is not universally true that he holds the property subject to the same equities as the debtor held it. Many transactions would be binding upon the latter which would not be binding upon the receiver. Thus all sales and securities made for the actual purpose of defrauding cred-

itors are of this class. The receiver does not represent the bank alone. He represents all the parties in interest. In other words, he represents the law which takes charge of the property for the benefit 'of all of the creditors according to their respective mutual rights. He is appointed for the very purpose of securing equal justice to all creditors of the bank, and under a law which positively forbids preference. Such an officer, I think (whatever may be the rule in case of voluntary assignments), may assert those rights of the general creditors which the law itself creates, without being subject to all of the disabilities under which the bank would labor in combating its private engagements with favored creditors. In other words, I am inclined to the view that a receiver, under the national banking act, may well oppose any privilege or preference which the law itself, unaided by a bona fide purchase or judgment, would regard as void against the general creditors in a direct contest between them and the parties claiming such preference, even though the bank, on account of some disability arising from its own acts or engagements, could not resist the claim. But in this case the defendant Schleier is not charged with any fraud, and it is not contended that the receiver represents either dissenting stockholders, or creditors of the bank who were creditors at the time of the execution of the lease. The bill is silent on this question, and the court must assume that the bank had no creditors at the time the lease was made. The receiver, then, represents the creditors, and the creditors, only, whose rights accrued subsequent to the execution of the lease, and the expenditure of the money used in the construction of the bank building. I think it must be held, therefore, that they are in no better position to question the validity of the transaction complained of than the bank itself. Could the bank avoid its obligations under the lease on the sole ground that in the execution of the lease and the construction of the building it had exceeded its charter powers, and therefore its acts were ultra vires? The answer to this question depends on whether there was an absolute want of power, or whether the acts complained of were merely an abuse of a power conferred. The general rule undoubtedly is that the powers of a corporation are such, and such only, as are conferred by the law under which it is incorporated. The charter is the measure of the powers of every corporation, and this rule applies to national banks as well as to other corporations, and is the test by which every corporate act is to be tried. It must be understood, however, that this rule necessarily concedes the usual proposition applicable to every legislative act; that is to say, that what is fairly implied is as much granted as if expressly enumerated. The national banking act expressly empowers a national banking association to purchase and hold real estate for certain specified purposes. Thus it may purchase and hold such real estate as may be necessary for its immediate accommodation in the transaction of its business, and this power unquestionably includes the right to take a lease for a term of years. It cannot be said, therefore, that there was an absolute want of power in the bank to take a lease for the purpose of securing to itself a banking house wherein to transact its business.

The most that can be said is that in taking a lease for a term extending beyond its corporate franchise it acted in excess of its powers. But this question cannot be litigated in this suit. The bank is expressly authorized to acquire and hold title to real estate for certain purposes and to a certain amount, and the question whether or not the particular real estate in controversy here was acquired for the purposes authorized, or in excess of the bank's powers, can only be raised by the United States. In Bank v. Matthews, 98 U. S. 628, 25 L. Ed. 190, it was held that, even where a corporation is incompetent by its charter to take title to real estate, a conveyance to it was not void, but only voidable, and that the sovereign alone could object. "It is valid," said the court, "until assailed in a direct proceeding instituted for that purpose." And in Silver Lake Bank v. North, 4 Johns. Ch. 370, the bank was a Pennsylvania corporation, and had taken a mortgage upon real estate in New York; and the defense to a bill to foreclose was that, by the act of incorporation, plaintiffs were not authorized to take a mortgage, except to secure a debt previously contracted in the course of its dealings, and the money in that case was lent after the bond and mortgage were executed. In disposing of the case, Chancellor Kent said:

"Perhaps it would be sufficient for this case that the plaintiffs are a duly-incorporated body, with authority to contract and take mortgages and judgments; and, if they should pass the exact line of their power, it would rather belong to the government of Pennsylvania to exact a forfeiture of their charter, than for this court, in this collateral way, to decide a question of misuser by setting aside a just and bona fide contract."

The fact that the bank could not personally enjoy the interest granted by this lease, after the expiration of its franchise, would not have the effect to cut down the estate granted. The bank had the power of alienation, and there is no reason why this lease could not be disposed of the same as real estate held in fee, or as any other asset of the bank. Express power is conferred upon the bank by the terms of the lease to assign and transfer its interest in the leasehold estate. A lease is property, and not a mere evidence of liability, and I can see no valid objection to a corporation making a lease which runs beyond the term of its corporate existence. Even if it be admitted that the lease between the bank and the defendant Schleier created an indebtedness in excess of its powers as prescribed in the national banking act, yet I am inclined to the view that the lease must be held valid. The statute does not in terms declare void the debt or liability so incurred. "The remedy," said the court in the case of Sioux City Terminal Railroad & Warehouse Co. v. Trust Co. of North America, 27 C. C. A. 73, 82 Fed. 124, "for the violation of this statute, is not the destruction of the contracts which evidence it, but the ouster and dissolution of the corporation at the suit of the state. The state alone can complain of it, and the debtor cannot usurp its functions."

Neither do I think that the contention of counsel for the plaintiff to the effect that the aggregate rent under the lease is to be considered as a liability or indebtedness of the bank can be sustained. A covenant to pay rent creates no debt until it becomes due, and

the liability incurred by the bank in this lease was merely a monthly liability to pay $1,164.58 monthly rent, which would cease upon the happening of one of several contingencies.

The lease in this case did not require the bank to build a $305,000 building. Neither does the complaint show that the bank, in constructing the building, contracted a dollar of indebtedness; but, even if the act of the bank in constructing so large a building was ultra vires, Mr. Schleier could not have interfered with such construction, and I do not see upon what theory he can be held liable for its cost, or a lien declared upon the land in favor of the plaintiff. City of Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132. The lease between the bank and Mr. Schleier was dated September 12, 1889. The bank building was completed in January, 1891, and the building was used by the bank from that time until November, 1897, when it surrendered the building to Mr. Schleier, and the lease was canceled. These contracts have all been fully executed, and cannot now be set aside, even though they were ultra vires. In the case of St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393, 12 Sup. Ct. 953, 36 L. Ed. 748, the court said:

"When the parties are in pari delicto, and the contract has been fully executed on the part of the plaintiff by the conveyance of property or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract."

Within the rule announced in this case, Mr. Schleier, after he turned over his land to the bank, and after he allowed the bank to construct its building thereon and remain in possession for seven years, could not come into court and obtain possession of his property, or in any way repudiate the lease, even though the bank admitted that the lease was ultra vires. Neither could the bank, to whose rights, as we have already seen, the plaintiff succeeds, after it had surrendered the building constructed on the premises leased, recover back either the building or its value. This proposition is, I think, conclusive of the case here.

Many other interesting questions were raised and discussed at the hearing, and have all been carefully considered; but, from the views already expressed, it becomes unnecessary to notice them separately. To do so would prolong this memorandum to an unwarranted length, and no useful purpose would be subserved thereby.

Let a decree be entered dismissing the bill at complainant's cost.